UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

SEP 28 ...

STATE OF CONNECTICUT,                                )
STATE OF NEW YORK,                                   )
PEOPLE OF THE STATE OF CALIFORNIA,                   )
   EX REL. ATTORNEY GENERAL                      )
   BILL LOCKYER,                                 )
STATE OF IOWA,                                       )
STATE OF NEW JERSEY,                                 )
STATE OF RHODE ISLAND,                               )   ECF CASE
STATE OF VERMONT,                                    )
STATE OF WISCONSIN,                                  )   Docket No. 04 CV 05669
CITY OF NEW YORK,                                    )   Hon. Loretta A. Preska, USDJ
                                                     )
         Plaintiffs,                        )   **AMENDED**
      v.                                      )   **NOTICE OF APPEAL**
                                                     )
AMERICAN ELECTRIC POWER COMPANY,                     )
   INC.,                                         )
AMERICAN ELECTRIC POWER SERVICE                      )
   CORPORATION,                                  )
THE SOUTHERN COMPANY,                                )
TENNESSEE VALLEY AUTHORITY,                          )
XCEL ENERGY INC.,                                    )
CINERGY CORPORATION,                                 )
                                                     )
         Defendants.                        )

--------------------------------------------------------------x

NOTICE IS HEREBY GIVEN that all plaintiffs in the above-named case hereby appeal to the
United States Court of Appeals for the Second Circuit from an Opinion and Order of the Court
dismissing the plaintiffs' complaint that was entered in this action on the 19th day of September,
2005 (Exhibit A), and from the Judgment entered accordingly by the Clerk of Court on
September 19, 2005 (Exhibit B) and from an Amended Opinion and Order of the Court
dismissing the plaintiffs' complaint that was entered on the 23rd day of September, 2005
(Exhibit C).

Dated: September 28, 2005.

FOR THE STATE OF NEW YORK          FOR THE STATE OF CONNECTICUT
ELIOT SPITZER                          RICHARD BLUMENTHAL
Attorney General                       Attorney General

By: _____

PETER LEHNER (PL2290)
J. JARED SNYDER (JS1541)
SIMON WYNN (SW0807)
Assistant Attorneys General
Environmental Protection Bureau
120 Broadway
New York, NY 10271
(212) 416-8450


FOR PEOPLE OF THE STATE OF
CALIFORNIA
    BILL LOCKYER
    Attorney General


By: _____

KEN ALEX (*Pro Hac Vice*)
WILLIAM BRIEGER
Deputy Attorneys General
1300 I Street
Sacramento, CA 95814
(916) 324-2512


FOR THE STATE OF NEW JERSEY
PETER C. HARVEY
Attorney General

By: _____

LISA J. MORELLI (*Pro Hac Vice*)
Deputy Attorney General
PO Box 093
Hughes Justice Complex
Trenton, NJ 08625
(609) 984-5612


By: _____

KIMBERLY MASSICOTTE
    (KM7666)
MATTHEW LEVINE (ML2346)
Assistant Attorneys General
P.O. Box 120
55 Elm Street
Hartford, CT  06141-0120
(860) 808-5250


FOR THE STATE OF IOWA
    THOMAS J. MILLER
    Attorney General
    TAM B. ORMISTON
    Deputy Attorney General

By: _____

DAVID R. SHERIDAN
(*Pro Hac Vice*)
Assistant Attorney General
Environmental Law Division
Lucas State Office Bldg.
321 E. 12th Street, Room 018
Des Moines, IA 50319
(515) 281-5351


FOR THE STATE OF RHODE ISLAND
PATRICK C. LYNCH
Attorney General

By: _____

MICHAEL RUBIN
Assistant Attorney General
Department of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

FOR THE STATE OF VERMONT
    WILLIAM H. SORRELL
    Attorney General

By:     _Erich Titrud | Cw_
    S. MARK SCIARROTTA (MS1771)
    ERICK TITRUD (*Pro Hac Vice*)
    Assistant Attorneys General
    109 State Street
    Montpelier, VT 05609-1001
    (802) 828-3186

FOR THE STATE OF WISCONSIN
    PEG LAUTENSCHLAGER
    Attorney General

By:     _Thomas J. Dawson | Cw_
    THOMAS J. DAWSON
    (*Pro Hac Vice*)
    Assistant Attorney General
    Director - Environmental Protection
    Unit
    Wisconsin Department of Justice
    17 West Main Street
    Madison, WI 53707-7857
    (608) 266-8987

FOR THE CITY OF NEW YORK
    MICHAEL A. CARDOZO
    Corporation Counsel of the City of
    New York

By:     _Susan M. Kath | Cw_
    SUSAN M. KATH (SK4547)
    SCOTT PASTERNACK (SP3293)
    MICHAEL BURGER (MB1127)
    Assistant Corporation Counsel
    New York City Law Department
    100 Church Street, Room 6-145
    New York, NY 10007
    (212) 676-8517

**EXHIBIT A**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
STATE OF CONNECTICUT, et al.,        :
                                     :
                    Plaintiffs,      :
                                     :
          -against-                  :
                                     :
AMERICAN ELECTRIC POWER              :
COMPANY, INC., et al.,               :
                                     :
                    Defendants.      :
-----------------------------------x
OPEN SPACE INSTITUTE, et al.,        :
                                     :
                    Plaintiffs,      :
                                     :     04 Civ. 5669 (LAP)
          -against-                  :     04 Civ. 5670 (LAP)
                                     :
AMERICAN ELECTRIC POWER              :
COMPANY, INC., et al.,               :     OPINION AND ORDER
                                     :
                    Defendants.      :
-----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

The Framers based our Constitution on the idea that a separation of powers enables a system of checks and balances, allowing our Nation to thrive under a Legislature and Executive that are accountable to the People, subject to judicial review by an independent Judiciary. See Federalist Paper No. 47 (1788); U.S. Const. arts. I, II, III. While, at times, some judges have become involved with the most critical issues affecting America, political questions are not the proper domain of judges. See, e.g., Baker v. Carr, 369 U.S. 186 (1962); Nixon v. United States, 506 U.S. 224 (1993). Were judges to resolve political questions, there would be no check on their resolutions because the

Judiciary is not accountable to any other branch or to the People. Thus, when cases present political questions, "judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances." Nixon, 506 U.S. at 234-35. As set out below, cases presenting political questions are consigned to the political branches that are accountable to the People, not to the Judiciary, and the Judiciary is without power to resolve them. This is one of those cases.

BACKGROUND[1]

The States of Connecticut, New York, California, Iowa, New Jersey, Rhode Island, Vermont, and Wisconsin and the City of New York (the "State Plaintiffs") and the Open Space Institute, Inc. ("OSI"), the Open Space Conservancy, Inc., and the Audubon Society of New Hampshire (the "Private Plaintiffs") (collectively, "Plaintiffs") bring the above-captioned actions against American Electric Power Company, Inc., American Electric Power Service Corporation (together, "AEP"), the Southern Company ("Southern"), Tennessee Valley Authority ("TVA"), Xcel Energy Inc. ("Xcel"), and Cinergy Corporation ("Cinergy") (collectively, "Defendants") under federal common law or, in the alternative,

---

[1]For the purposes of these motions, the allegations of the complaints are accepted as true. See Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000); Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).

state law, to abate what Plaintiffs describe as the "public nuisance" of "global warming." State Compl. ¶ 1;[2] OSI Compl. ¶ 1.[3]  Defendants now move to dismiss the complaints for, <u>inter alia</u>, lack of jurisdiction and failure to state a claim upon which relief can be granted.  For the reasons set forth below, Defendants' motions are granted.

The State Plaintiffs, claiming to represent the interests of more than 77 million people and their related environments, natural resources, and economies, and the Private Plaintiffs, non-profit land trusts, bring these federal common law public nuisance actions to abate what they allege to be Defendants' contributions to the phenomenon commonly known as global warming. State Compl. ¶¶ 1, 146; OSI Compl. ¶¶ 1, 92, 103. Plaintiffs assert that the Defendants collectively emit approximately 650 million tons of carbon dioxide annually, State Compl. ¶ 2; OSI Compl. ¶ 3, that carbon dioxide is the primary greenhouse gas, State Compl. ¶ 1; OSI Compl. ¶ 2, and that greenhouse gases trap atmospheric heat and cause global warming, State Compl. ¶ 1; OSI Compl. ¶ 2.

As part of their venue allegations, Plaintiffs maintain that global warming will cause irreparable harm to property in

---

[2]"State Compl." refers to the complaint filed by the State Plaintiffs (captioned 04 Civ. 5669 (LAP)) on July 22, 2004.

[3]"OSI Compl." refers to the complaint filed by the Private Plaintiffs (captioned 04 Civ. 5670 (LAP)) on July 22, 2004.

New York State and New York City and that it threatens the
health, safety, and well-being of New York's citizens, residents,
and environment. State Compl. ¶¶ 2, 20, 24, 26, 30, 34, 159; OSI
Compl. ¶¶ 80-88, 93.

        According to the complaints, Defendants "are the five
largest emitters of carbon dioxide in the United States" and
their emissions "constitute approximately one quarter of the U.S.
electric power sector's carbon dioxide emissions." State Compl.
¶ 98; OSI Compl. ¶ 55.  According to the complaints, U.S.
electric power plants are responsible for "ten percent of
worldwide carbon dioxide emissions from human activities." State
Compl. ¶ 100; OSI Compl. ¶ 53.

        State Plaintiffs assert that global warming has already
occurred in the form of a documented increase in average
temperatures in the United States of between .74 and 5 degrees
Fahrenheit since 1900, State Compl. ¶¶ 103, 104, and a decline in
snowfall and the duration of snow cover in recent decades, State
Compl. ¶ 105, 106.  In addition to what State Plaintiffs say are
these already-documented climate changes, the United States
Environmental Protection Agency (the "EPA") projects an increase
in temperature of approximately 4 to 5 degrees by the year 2100.
State Compl. ¶ 106.  Private Plaintiffs assert that the
Intergovernmental Panel on Climate Change projects that the
global average surface air temperature will increase

4

approximately 2.5 to 10.4 degrees Fahrenheit from the year 1990 to 2100. OSI Compl. ¶ 61.

Plaintiffs say the natural processes that remove carbon dioxide from the atmosphere now are unable to keep pace with the level of carbon dioxide emissions. State Compl. ¶ 87; OSI Compl. ¶ 51. As a result, Plaintiffs allege, carbon dioxide levels have increased approximately 34% since the industrial revolution began, causing increased temperatures. State Compl. ¶ 88; OSI Compl. ¶ 50. Plaintiffs further allege that because the planet's natural systems take hundreds of years to absorb carbon dioxide, Defendants' past, present, and future emissions will remain in the atmosphere and contribute to global warming for many decades and, possibly, centuries. State Compl. ¶ 102; OSI Compl. ¶ 56. Although Plaintiffs acknowledge that there is some dispute about the rate and intensity of the process of global climate change, Plaintiffs say official reports from American and international scientific bodies demonstrate the clear scientific consensus that global warming has begun, is altering the natural world, and will accelerate over the coming decades unless action is taken to reduce emissions of carbon dioxide. State Compl. ¶¶ 80, 81; OSI Compl. ¶¶ 44-47.

Congress has recognized that carbon dioxide emissions cause global warming and that global warming will have severe adverse impacts in the United States, but it has declined to

impose any formal limits on such emissions. See, e.g., The Global Climate Protection Act of 1987, P.L. 100-204, Title XI, §§1102-03, reprinted at 15 U.S.C. § 2901 note.  However, Congress and the Executive Branch have taken several steps to better understand and address the complex issue of global warming.  As early as 1978, Congress established a "national climate program" to improve understanding of global climate change through research, data collection, assessments, information dissemination, and international cooperation. See National Climate Program Act of 1978, 15 U.S.C. §§ 2901, et seq.  Two years later, in the Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980), Congress directed the Office of Science and Technology Policy to engage the National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities" authorized by the Energy Security Act.  In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. See 15 U.S.C. § 2901 note; see also id. § 2952(a) (directing the President and Secretary of State in 1990 to "initiate discussions" with other nations for agreements on climate research).

In 1990, Congress enacted the Global Change Research Act, 15 U.S.C. §§ 2931-2938, which established a ten-year research program for global climate issues, id. § 2932, directed the President to establish a research program to "improve understanding of global change," id. § 2933, and provided for scientific assessments every four years that "analyze[] current trends in global change," id. § 2936(3). Congress also established a program to research agricultural issues related to global climate change, Pub. L. No. 101-624, tit. XXIV, § 2402, 104 Stat. 4058, 4058-59 (1990), and, two years later, directed the Secretary of Energy to conduct several assessments related to greenhouse gases and report to Congress, Energy Policy Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

In 1992, as a result of the negotiations authorized by the Global Climate Protection Act of 1987, President George H. W. Bush signed, and the Senate ratified, the United Nations Framework Convention on Climate Change ("UNFCCC"), which brought together a coalition of countries to work toward a coordinated approach to address the international issue of global warming. Following ratification of the UNFCCC, member nations negotiated the Kyoto Protocol, which called for mandatory reductions in the greenhouse gas emissions of developed nations. See UNFCCC, Kyoto Protocol (Dec. 11, 1997).

Although President William Jefferson Clinton signed the Kyoto Protocol, it was not presented to the Senate, which formally expressed misgivings over the prospect that the potential economic burdens of carbon dioxide reductions would be shouldered exclusively by developed nations, such as the United States. S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0 to urge the President not to sign any agreement that would result in serious harm to the economy or that did not include provisions regarding the emissions of developing nations). Thereafter, Congress passed a series of bills that affirmatively barred the EPA from implementing the Protocol. See Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106- 377, 114 Stat. 1141, 1441A-41 (2000). The EPA has ruled that the Clean Air Act does not authorize carbon dioxide regulation. Control of Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922 (Sept. 8, 2003).

President George W. Bush opposes the Protocol because it exempts developing nations who are major emitters, fails to address two major pollutants, and would have a negative economic impact on the United States. See Transcript, President Bush Discusses Global Climate Change (Jun. 11, 2001). Instead, the policy of the current administration "emphasizes international cooperation and promotes working with other nations to develop an efficient and coordinated response to global climate change,"

8

which the EPA describes as a "prudent," "realistic and effective long-term approach to the global climate change issue." 68 Fed. Reg. at 52933.

Here, to curtail Defendants' contribution to global warming, Plaintiffs "seek an order (i) holding each of the Defendants jointly and severally liable for contributing to an ongoing public nuisance, global warming, and (ii) enjoining each of the Defendants to abate its contribution to the nuisance by capping its emissions of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade." State Compl. ¶ 6; OSI Compl. ¶ 10.  According to Plaintiffs, the unspecified reductions they seek "will contribute to a reduction in the risk and threat of injury to the plaintiffs and their citizens and residents from global warming." State Compl. ¶ 148; OSI Compl. ¶ 90.

By way of a variety of motions, supported by Unions for Jobs and the Environment and opposed by the Association of the Bar of the City of New York, as amici, Defendants move to dismiss the complaints against them on several grounds.  First, Defendants contend that Plaintiffs have failed to state a claim upon which relief can be granted because: (1) there is no recognized federal common law cause of action to abate greenhouse gas emissions that allegedly contribute to global warming; (2) separation of powers principles preclude this Court from

9

adjudicating these actions; and (3) Congress has displaced any federal common law cause of action to address the issue of global warming.  Second, Defendants contend that this Court lacks jurisdiction over Plaintiffs' claims because:  (1) Plaintiffs do not have standing to sue on account of global warming and (2) Plaintiffs' failure to state a claim under federal law divests the Court of § 1331 jurisdiction. Def. Memo. at 27.[4]  In addition to advancing these primary arguments, Defendants Southern, TVA, Xcel, and Cinergy move to dismiss for lack of personal jurisdiction, and TVA moves to dismiss because, as an agency and instrumentality of the United States, it claims that it cannot be sued for a tort when the subject of the lawsuit is the actions it performs as part of its discretionary functions. TVA Memo. at 11-12.[5]

———

## DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires dismissal of complaints that are not legally sufficient. Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Rule

---

[4]"Def. Memo." refers to the Memorandum of Law in Support of Defendants' Motions to Dismiss the Complaints for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted filed on September 30, 2004.

[5]"TVA Memo." refers to the Memorandum of Law in Support of Tennessee Valley Authority's Motions to Dismiss on Federal Discretionary Function Grounds filed on September 30, 2004.

12(b)(1) requires dismissal when "the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)). Under both rules, as noted above, this Court must accept the allegations of the complaints as true and construe all reasonable inferences in favor of Plaintiffs. See supra note 1.

Because federal courts are courts of limited jurisdiction, whether a court has jurisdiction is an issue generally to be addressed first. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95 (1998). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Id. at 94-95 (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). "[E]ither the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party." Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 215 (1974) (internal citations omitted).

The threshold jurisdictional question in this case is whether the complaints raise non-justiciable political questions

that are beyond the limits of this Court's jurisdiction.[6]
Defendants argue that "separation-of-powers principles foreclose
recognition of the unprecedented 'nuisance' action plaintiffs
assert," <u>see</u> Def. Reply Memo. at 7,[7] which I take to be an
argument that Plaintiffs raise a non-justiciable political
question.  At oral argument, counsel for AEP and Cinergy argued
that by "asking this Court to resolve an environmental policy
question with sweeping implications for the nation's economy, its
foreign relations, and even potentially its national security,"
Plaintiffs "have put the cart before the horse." Tr. 6:1-6:5;
11:11.[8]  Defendants AEP and Cinergy also note that the Supreme
Court imposes on courts "an unflagging duty" to exercise their
jurisdiction appropriately and refrain from resolving questions
of high policy, which are for the political branches. Tr. 10:22-

---

[6]The extraordinary allegations and relief sought in this
case render it one in which an analysis of Plaintiffs' standing
would involve an analysis of the merits of Plaintiffs' claims.
For example, determining causation and redressibility in the
context of alleged global warming would require me to make
judgments that could have an impact on the other branches'
responses to what is plainly a political question.  Accordingly,
because the issue of Plaintiffs' standing is so intertwined with
the merits and because the federal courts lack jurisdiction over
this patently political question, I do not address the question
of Plaintiffs' standing.

[7]"Def. Reply Memo." refers to the Reply in Support of
Defendants' Motions to Dismiss the Complaints for Lack of Subject
Matter Jurisdiction and for Failure to State a Claim Upon Which
Relief Can Be Granted filed on December 17, 2004.

[8]"Tr." refers to the transcript of the oral arguments held
on August 12, 2005.

10:25; 11:17-11:19. Accordingly, this issue will be addressed
first.

     To determine if a case is justiciable in light of the
separation of powers ordained by the Constitution, a court must
decide "whether the duty asserted can be judicially identified
and its breach judicially determined, and whether protection for
the right asserted can be judicially molded." Baker v. Carr, 369
U.S. 186, 198 (1962). Six situations have been recognized as
indicating the existence of a non-justiciable political question:

> [1] a textually demonstrable constitutional
> commitment of the issue to a coordinate
> political department; or [2] a lack of
> judicially discoverable and manageable
> standards for resolving it; or [3] the
> impossibility of deciding without an initial
> policy determination of a kind clearly for
> nonjudicial discretion; or [4] the
> impossibility of a court's undertaking
> independent resolution without expressing lack
> of the respect due coordinate branches of the
> government; or [5] an unusual need for
> unquestioning adherence to a political
> decision already made; or [6] the potentiality
> of embarrassment from multifarious
> pronouncements by various departments on one
> question.

Vieth v. Jubelirer, 541 U.S. 267, 277-78 (2004) (quoting Baker v.
Carr, 369 U.S. 186, 217 (1962)). Although several of these
indicia have formed the basis for finding that Plaintiffs raise a
non-justiciable political question, the third indicator is
particularly pertinent to this case.

13

As noted above, a non-justiciable political question exists when a court confronts "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." <u>Vieth</u>, 541 U.S. at 278.  As the Supreme Court has recognized, to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs." <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 847 (1984).  In this case, balancing those interests, together with the other interests involved, is impossible without an "initial policy determination" first having been made by the elected branches to which our system commits such policy decisions, <u>viz.</u>, Congress and the President.

Plaintiffs advance a number of arguments why theirs is a simple nuisance claim of the kind courts have adjudicated in the past, but none of the pollution-as-public-nuisance cases[9] cited by Plaintiffs has touched on so many areas of national and

---

[9]Plaintiffs rely on, for example, <u>New Jersey v. New York City</u>, 283 U.S. 473, 476-77 (1931) (involving garbage dumped into the ocean that polluted New Jersey beaches); <u>Georgia v. Tennessee Copper Co.</u>, 206 U.S. 230, 236 (1907) (involving a company discharging noxious gas that threatened forests, orchards, and crops in five counties); <u>State of New York v. Shore Realty Corp.</u>, 758 F.2d 1032, 1038 (2d Cir. 1984) (involving more than eleven tanks and 400 drums of substances that are considered "hazardous" within the meaning of CERCLA).

14

international policy.  The scope and magnitude of the relief
Plaintiffs seek reveals the transcendently legislative nature of
this litigation.  Plaintiffs ask this Court to cap carbon dioxide
emissions and mandate annual reductions of an as-yet-unspecified
percentage. State Compl., Prayer for Relief ¶ b.  Such relief
would, at a minimum, require this Court to: (1) determine the
appropriate level at which to cap the carbon dioxide emissions of
these Defendants; (2) determine the appropriate percentage
reduction to impose upon Defendants; (3) create a schedule to
implement those reductions; (4) determine and balance the
implications of such relief on the United States' ongoing
negotiations with other nations concerning global climate change;
(5) assess and measure available alternative energy resources;
and (6) determine and balance the implications of such relief on
the United States' energy sufficiency and thus its national
security--all without an "initial policy determination" having
been made by the elected branches.

        Defendants have set forth just a few of the difficult
"initial policy determination[s]" that would have to be made by
the elected branches before any court could address these issues:

> [G]iven the numerous contributors of
> greenhouse gases, should the societal costs of
> reducing such emissions be borne by just a
> segment of the electricity-generating industry
> and their industrial and other consumers?
>
> Should those costs be spread across the entire
> electricity-generating industry (including

15

> utilities in the plaintiff States)?    Other
> industries?
>
> What are the economic implications of these
> choices?
>
> What are the implications for the nation's
> energy independence and, by extension, its
> national security?

Def. Memo. at 7-8.

If there is any doubt as to the complexity of the
"initial policy determination[s]" that must be made by the
elected branches before a non-elected court can properly
adjudicate a global warming nuisance claim, one need only look to
the statements of the EPA, the agency in which "Congress has
vested administrative authority" over the "technically complex
area of environmental law," New England Legal Foundation v.
Costle, 666 F.2d 30, 33 (2d Cir. 1981), and which has been
grappling with the proper approach to the issue of global climate
change for years.  For example:

> It is hard to imagine any issue in the
> environmental area having greater "economic
> and political significance" than regulation of
> activities that might lead to global climate
> change. 68 Fed. Reg. 52922, 52928 (Sep. 8,
> 2003).
>
> The issue of global climate change . . . has
> been discussed extensively during the last
> three Presidential campaigns; it is the
> subject of debate and negotiation in several
> international bodies; and numerous bills have
> been introduced in Congress over the last 15
> years to address the issue. 68 Fed. Reg. at
> 52928.

16

> Unilateral [regulation of carbon dioxide emissions in the United States] could also weaken U.S. efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their economies. 68 Fed. Reg. at 52931.

> Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them. 68 Fed. Reg. at 52931.

> Virtually every sector of the U.S. economy is either directly or indirectly a source of [greenhouse gas] emissions, and the countries of the world are involved in scientific, technical, and political-level discussions about climate change. 68 Fed. Reg. at 52928.

Considering these statements in no way undermines the longstanding principle that the judicial branch, not the political branches, determines, on a case-by-case basis, when a political question is raised. Looking at the past and current actions (and deliberate inactions) of Congress and the Executive within the United States and globally in response to the issue of climate change merely reinforces my opinion that the questions raised by Plaintiffs' complaints are non-judiciable political questions.

The parties dispute what effect, if any, the relief sought by Plaintiffs would have on United States foreign relations. Plaintiffs contend that there would no effect because the "[o]fficial United States policy is to reduce domestic

17

emissions." Pl. Opp. at 20.[10]  Plaintiffs cite, <u>inter alia</u>, EPA

and DOE's promotion of voluntary efforts to reduce greenhouse gas

emissions, the President's statement that "[we] can make great

progress in reducing emissions, and we will.  Yet, even that

isn't enough," Congress' commissioning of research on

technologies to reduce carbon dioxide emissions, and the UNFCCC's

references to limiting emissions. Pl. Opp. at 21.  However,

official United States policy is expressed by statutes and

treaties in force, not press releases.  And "[a]s Justice

Frankfurter observed, in interpreting a statute, '[o]ne

must . . . listen attentively to what it does not say.'"

<u>Commonwealth of Mass. v. United States EPA</u>, 2004 WL 2584896, at

*11 (D.C. Cir. Nov. 2, 2004) (citing Felix Frankfurter, <u>Some</u>

<u>Reflections on the Reading of Statutes</u>, 47 Colum. L. Rev. 527,

536 (1947)).  The explicit statements of Congress and the

Executive on the issue of global climate change in general and

their specific refusal to impose the limits on carbon dioxide

emissions Plaintiffs now seek to impose by judicial fiat confirm

that making the "initial policy determination[s]" addressing

global climate change is an undertaking for the political

branches.

---

[10]"Pl. Opp." refers to the Plaintiffs' Memorandum of Law in
Opposition to Defendants' Motions to Dismiss the Complaints for
Lack of Subject Matter Jurisdiction and for Failure to State a
Claim Upon Which Relief Can Be Granted filed on November 19,
2004.

Because resolution of the issues presented here requires identification and balancing of economic, environmental, foreign policy, and national security interests, "an initial policy determination of a kind clearly for non-judicial discretion" is required. <u>Vieth</u>, 541 U.S. at 278 (quoting <u>Baker</u>, 369 U.S. at 212). Indeed, the questions presented here "uniquely demand single-voiced statement of the Government's views." <u>Baker</u>, 369 U.S. at 211. Thus, these actions present non-justiciable political questions that are consigned to the political branches, not the Judiciary.

<u>CONCLUSION</u>

For the reasons set forth above, the complaints are dismissed. The Clerk of the Court shall mark these actions closed and all pending motions denied as moot.

SO ORDERED

September 15, 2005

_Loretta A. Preska_
Loretta A. Preska, U.S.D.J.

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____               │
│ DATE FILED: ___9/19/05___        │
└─────────────────────────────────┘
```

------------------------------------------------X

STATE OF CONNECTICUT, et al.,

                         Plaintiffs,                    04 CIVIL 5669 (LAP)
                                                        04 CIVIL 5670 (LAP)
        -against-                                       **JUDGMENT**

AMERICAN ELECTRIC POWER COMPANY,
INC., et al.,

                         Defendants.
------------------------------------------------X
OPEN SPACE INSTITUTE, et al.,
                         Plaintiffs,


        -against-

AMERICAN ELECTRIC POWER COMPANY,
INC., et al.,

                         Defendants.
------------------------------------------------X


        Defendants having moved to dismiss the complaints, and the matter having come before the

Honorable Loretta A. Preska, United States District Judge, and the Court, on September 15, 2005,

having rendered its Opinion and Order dismissing the complaints, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated September 15, 2005, the complaints are dismissed; accordingly,

these cases are closed and all pending motions denied as moot.

**Dated:** New York, New York
        September 19, 2005

                                        **J. MICHAEL McMAHON**
                                        _____
                                        **Clerk of Court**

                        **BY:**         _____

                                        **Deputy Clerk**


                THIS DOCUMENT WAS ENTERED
                ON THE DOCKET ON _____

**EXHIBIT C**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
STATE OF CONNECTICUT, et al.,      :
                                   :
                  Plaintiffs,      :
                                   :
        -against-                  :
                                   :
AMERICAN ELECTRIC POWER            :
COMPANY, INC., et al.,             :
                                   :
                  Defendants.      :
----------------------------------x
OPEN SPACE INSTITUTE, et al.,      :
                                   :
                  Plaintiffs,      :
                                   :   04 Civ. 5669 (LAP)
        -against-                  :   04 Civ. 5670 (LAP)
                                   :
AMERICAN ELECTRIC POWER            :        AMENDED
COMPANY, INC., et al.,             :   OPINION AND ORDER
                                   :
                  Defendants.      :
----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

        The Framers based our Constitution on the idea that a
separation of powers enables a system of checks and balances,
allowing our Nation to thrive under a Legislature and Executive
that are accountable to the People, subject to judicial review by
an independent Judiciary. See Federalist Paper No. 47 (1788);
U.S. Const. arts. I, II, III.  While, at times, some judges have
become involved with the most critical issues affecting America,
political questions are not the proper domain of judges. See,
e.g., Baker v. Carr, 369 U.S. 186 (1962); Nixon v. United States,
506 U.S. 224 (1993).  Were judges to resolve political questions,
there would be no check on their resolutions because the

Judiciary is not accountable to any other branch or to the People.  Thus, when cases present political questions, "judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances."  <u>Nixon</u>, 506 U.S. at 234-35.  As set out below, cases presenting political questions are consigned to the political branches that are accountable to the People, not to the Judiciary, and the Judiciary is without power to resolve them.  This is one of those cases.

BACKGROUND[1]

The States of Connecticut, New York, California, Iowa, New Jersey, Rhode Island, Vermont, and Wisconsin and the City of New York (the "State Plaintiffs") and the Open Space Institute, Inc. ("OSI"), the Open Space Conservancy, Inc., and the Audubon Society of New Hampshire (the "Private Plaintiffs") (collectively, "Plaintiffs") bring the above-captioned actions against American Electric Power Company, Inc., American Electric Power Service Corporation (together, "AEP"), the Southern Company ("Southern"), Tennessee Valley Authority ("TVA"), Xcel Energy Inc. ("Xcel"), and Cinergy Corporation ("Cinergy") (collectively, "Defendants") under federal common law or, in the alternative,

---

[1]For the purposes of these motions, the allegations of the complaints are accepted as true. <u>See</u> <u>Tarshis v. Riese Org.</u>, 211 F.3d 30, 35 (2d Cir. 2000); <u>Desiderio v. National Ass'n of Secs. Dealers, Inc.</u>, 191 F.3d 198, 202 (2d Cir. 1999); <u>Jaghory v. New York State Dep't of Educ.</u>, 131 F.3d 326, 329 (2d Cir. 1997).

2

state law, to abate what Plaintiffs describe as the "public nuisance" of "global warming." State Compl. ¶ 1;[2] OSI Compl. ¶ 1.[3]  Defendants now move to dismiss the complaints for, <u>inter alia</u>, lack of jurisdiction and failure to state a claim upon which relief can be granted.  For the reasons set forth below, Defendants' motions are granted.

 The State Plaintiffs, claiming to represent the interests of more than 77 million people and their related environments, natural resources, and economies, and the Private Plaintiffs, non-profit land trusts, bring these federal common law public nuisance actions to abate what they allege to be Defendants' contributions to the phenomenon commonly known as global warming. State Compl. ¶¶ 1, 146; OSI Compl. ¶¶ 1, 92, 103. Plaintiffs assert that the Defendants collectively emit approximately 650 million tons of carbon dioxide annually, State Compl. ¶ 2; OSI Compl. ¶ 3, that carbon dioxide is the primary greenhouse gas, State Compl. ¶ 1; OSI Compl. ¶ 2, and that greenhouse gases trap atmospheric heat and cause global warming, State Compl. ¶ 1; OSI Compl. ¶ 2.

 As part of their venue allegations, Plaintiffs maintain that global warming will cause irreparable harm to property in

---

[2]"State Compl." refers to the complaint filed by the State Plaintiffs (captioned 04 Civ. 5669 (LAP)) on July 22, 2004.

[3]"OSI Compl." refers to the complaint filed by the Private Plaintiffs (captioned 04 Civ. 5670 (LAP)) on July 22, 2004.

New York State and New York City and that it threatens the
health, safety, and well-being of New York's citizens, residents,
and environment. State Compl. ¶¶ 2, 20, 24, 26, 30, 34, 159; OSI
Compl. ¶¶ 80-88, 93.

According to the complaints, Defendants "are the five
largest emitters of carbon dioxide in the United States" and
their emissions "constitute approximately one quarter of the U.S.
electric power sector's carbon dioxide emissions." State Compl.
¶ 98; OSI Compl. ¶ 55.  According to the complaints, U.S.
electric power plants are responsible for "ten percent of
worldwide carbon dioxide emissions from human activities." State
Compl. ¶ 100; OSI Compl. ¶ 53.

State Plaintiffs assert that global warming has already
occurred in the form of a documented increase in average
temperatures in the United States of between .74 and 5 degrees
Fahrenheit since 1900, State Compl. ¶¶ 103, 104, and a decline in
snowfall and the duration of snow cover in recent decades, State
Compl. ¶ 105, 106.  In addition to what State Plaintiffs say are
these already-documented climate changes, the United States
Environmental Protection Agency (the "EPA") projects an increase
in temperature of approximately 4 to 5 degrees by the year 2100.
State Compl. ¶ 106.  Private Plaintiffs assert that the
Intergovernmental Panel on Climate Change projects that the
global average surface air temperature will increase

4

approximately 2.5 to 10.4 degrees Fahrenheit from the year 1990
to 2100. OSI Compl. ¶ 61.

Plaintiffs say the natural processes that remove carbon
dioxide from the atmosphere now are unable to keep pace with the
level of carbon dioxide emissions. State Compl. ¶ 87; OSI Compl.
¶ 51.  As a result, Plaintiffs allege, carbon dioxide levels have
increased approximately 34% since the industrial revolution
began, causing increased temperatures. State Compl. ¶ 88; OSI
Compl. ¶ 50.  Plaintiffs further allege that because the planet's
natural systems take hundreds of years to absorb carbon dioxide,
Defendants' past, present, and future emissions will remain in
the atmosphere and contribute to global warming for many decades
and, possibly, centuries. State Compl. ¶ 102; OSI Compl. ¶ 56.
Although Plaintiffs acknowledge that there is some dispute about
the rate and intensity of the process of global climate change,
Plaintiffs say official reports from American and international
scientific bodies demonstrate the clear scientific consensus that
global warming has begun, is altering the natural world, and will
accelerate over the coming decades unless action is taken to
reduce emissions of carbon dioxide. State Compl. ¶¶ 80, 81; OSI
Compl. ¶¶ 44-47.

Congress has recognized that carbon dioxide emissions
cause global warming and that global warming will have severe
adverse impacts in the United States, but it has declined to

5

impose any formal limits on such emissions. See, e.g., The Global Climate Protection Act of 1987, P.L. 100-204, Title XI, §§1102-03, reprinted at 15 U.S.C. § 2901 note.  However, Congress and the Executive Branch have taken several steps to better understand and address the complex issue of global warming.  As early as 1978, Congress established a "national climate program" to improve understanding of global climate change through research, data collection, assessments, information dissemination, and international cooperation. See National Climate Program Act of 1978, 15 U.S.C. §§ 2901, et seq.  Two years later, in the Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (1980), Congress directed the Office of Science and Technology Policy to engage the National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities" authorized by the Energy Security Act.  In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. See 15 U.S.C. § 2901 note; see also id. § 2952(a) (directing the President and Secretary of State in 1990 to "initiate discussions" with other nations for agreements on climate research).

6

In 1990, Congress enacted the Global Change Research Act, 15 U.S.C. §§ 2931-2938, which established a ten-year research program for global climate issues, id. § 2932, directed the President to establish a research program to "improve understanding of global change," id. § 2933, and provided for scientific assessments every four years that "analyze[] current trends in global change," id. § 2936(3).  Congress also established a program to research agricultural issues related to global climate change, Pub. L. No. 101-624, tit. XXIV, § 2402, 104 Stat. 4058, 4058-59 (1990), and, two years later, directed the Secretary of Energy to conduct several assessments related to greenhouse gases and report to Congress, Energy Policy Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

In 1992, as a result of the negotiations authorized by the Global Climate Protection Act of 1987, President George H. W. Bush signed, and the Senate ratified, the United Nations Framework Convention on Climate Change ("UNFCCC"), which brought together a coalition of countries to work toward a coordinated approach to address the international issue of global warming. Following ratification of the UNFCCC, member nations negotiated the Kyoto Protocol, which called for mandatory reductions in the greenhouse gas emissions of developed nations. See UNFCCC, Kyoto Protocol (Dec. 11, 1997).

7

Although President William Jefferson Clinton signed the
Kyoto Protocol, it was not presented to the Senate, which
formally expressed misgivings over the prospect that the
potential economic burdens of carbon dioxide reductions would be
shouldered exclusively by developed nations, such as the United
States. S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0
to urge the President not to sign any agreement that would result
in serious harm to the economy or that did not include provisions
regarding the emissions of developing nations).  Thereafter,
Congress passed a series of bills that affirmatively barred the
EPA from implementing the Protocol. See Pub. L. No. 105-276, 112
Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080
(1999); Pub. L. No. 106- 377, 114 Stat. 1141, 1441A-41 (2000).
The EPA has ruled that the Clean Air Act does not authorize
carbon dioxide regulation. Control of Emissions from New Highway
Vehicles and Engines, 68 Fed. Reg. 52,922 (Sept. 8, 2003).

President George W. Bush opposes the Protocol because
it exempts developing nations who are major emitters, fails to
address two major pollutants, and would have a negative economic
impact on the United States. See Transcript, President Bush
Discusses Global Climate Change (Jun. 11, 2001).  Instead, the
policy of the current administration "emphasizes international
cooperation and promotes working with other nations to develop an
efficient and coordinated response to global climate change,"

8

which the EPA describes as a "prudent," "realistic and effective
long-term approach to the global climate change issue." 68 Fed.
Reg. at 52933.

        Here, to curtail Defendants' contribution to global
warming, Plaintiffs "seek an order (i) holding each of the
Defendants jointly and severally liable for contributing to an
ongoing public nuisance, global warming, and (ii) enjoining each
of the Defendants to abate its contribution to the nuisance by
capping its emissions of carbon dioxide and then reducing those
emissions by a specified percentage each year for at least a
decade." State Compl. ¶ 6; OSI Compl. ¶ 10.  According to
Plaintiffs, the unspecified reductions they seek "will contribute
to a reduction in the risk and threat of injury to the plaintiffs
and their citizens and residents from global warming." State
Compl. ¶ 148; OSI Compl. ¶ 90.

        By way of a variety of motions, supported by Unions for
Jobs, as amicus, Defendants move to dismiss the complaints
against them on several grounds.  First, Defendants contend that
Plaintiffs have failed to state a claim upon which relief can be
granted because: (1) there is no recognized federal common law
cause of action to abate greenhouse gas emissions that allegedly
contribute to global warming; (2) separation of powers principles
preclude this Court from adjudicating these actions; and (3)
Congress has displaced any federal common law cause of action to

9

address the issue of global warming.  Second, Defendants contend

that this Court lacks jurisdiction over Plaintiffs' claims

because:  (1) Plaintiffs do not have standing to sue on account

of global warming and (2) Plaintiffs' failure to state a claim

under federal law divests the Court of § 1331 jurisdiction. Def.

Memo. at 27.[4]  In addition to advancing these primary arguments,

Defendants Southern, TVA, Xcel, and Cinergy move to dismiss for

lack of personal jurisdiction, and TVA moves to dismiss because,

as an agency and instrumentality of the United States, it claims

that it cannot be sued for a tort when the subject of the lawsuit

is the actions it performs as part of its discretionary

functions. TVA Memo. at 11-12.[5]

_____

DISCUSSION

Rule 12(b)(6) of the Federal Rules of Civil Procedure

requires dismissal of complaints that are not legally sufficient.

Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Rule

12(b)(1) requires dismissal when "the district court lacks the

statutory or constitutional power to adjudicate it." Makarova v.

_____

[4]"Def. Memo." refers to the Memorandum of Law in Support of
Defendants' Motions to Dismiss the Complaints for Lack of Subject
Matter Jurisdiction and for Failure to State a Claim Upon Which
Relief Can Be Granted filed on September 30, 2004.

[5]"TVA Memo." refers to the Memorandum of Law in Support of
Tennessee Valley Authority's Motions to Dismiss on Federal
Discretionary Function Grounds filed on September 30, 2004.

United States, 201 F.3d 110, 113 (2d Cir. 2000). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)). Under both rules, as noted above, this Court must accept the allegations of the complaints as true and construe all reasonable inferences in favor of Plaintiffs. See supra note 1.

Because federal courts are courts of limited jurisdiction, whether a court has jurisdiction is an issue generally to be addressed first. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 95 (1998). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Id. at 94-95 (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). "[E]ither the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party." Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 215 (1974) (internal citations omitted).

The threshold jurisdictional question in this case is whether the complaints raise non-justiciable political questions

that are beyond the limits of this Court's jurisdiction.[6]
Defendants argue that "separation-of-powers principles foreclose
recognition of the unprecedented 'nuisance' action plaintiffs
assert," <u>see</u> Def. Reply Memo. at 7,[7] which I take to be an
argument that Plaintiffs raise a non-justiciable political
question.  At oral argument, counsel for AEP and Cinergy argued
that by "asking this Court to resolve an environmental policy
question with sweeping implications for the nation's economy, its
foreign relations, and even potentially its national security,"
Plaintiffs "have put the cart before the horse." Tr. 6:1-6:5;
11:11.[8]  Defendants AEP and Cinergy also note that the Supreme
Court imposes on courts "an unflagging duty" to exercise their
jurisdiction appropriately and refrain from resolving questions
of high policy, which are for the political branches. Tr. 10:22-

---

[6]The extraordinary allegations and relief sought in this
case render it one in which an analysis of Plaintiffs' standing
would involve an analysis of the merits of Plaintiffs' claims.
For example, determining causation and redressibility in the
context of alleged global warming would require me to make
judgments that could have an impact on the other branches'
responses to what is plainly a political question.  Accordingly,
because the issue of Plaintiffs' standing is so intertwined with
the merits and because the federal courts lack jurisdiction over
this patently political question, I do not address the question
of Plaintiffs' standing.

[7]"Def. Reply Memo." refers to the Reply in Support of
Defendants' Motions to Dismiss the Complaints for Lack of Subject
Matter Jurisdiction and for Failure to State a Claim Upon Which
Relief Can Be Granted filed on December 17, 2004.

[8]"Tr." refers to the transcript of the oral arguments held
on August 12, 2005.

10:25; 11:17-11:19. Accordingly, this issue will be addressed first.

To determine if a case is justiciable in light of the separation of powers ordained by the Constitution, a court must decide "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." Baker v. Carr, 369 U.S. 186, 198 (1962). Six situations have been recognized as indicating the existence of a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Vieth v. Jubelirer, 541 U.S. 267, 277-78 (2004) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). Although several of these indicia have formed the basis for finding that Plaintiffs raise a non-justiciable political question, the third indicator is particularly pertinent to this case.

13

As noted above, a non-justiciable political question exists when a court confronts "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." <u>Vieth</u>, 541 U.S. at 278. As the Supreme Court has recognized, to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs." <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 847 (1984). In this case, balancing those interests, together with the other interests involved, is impossible without an "initial policy determination" first having been made by the elected branches to which our system commits such policy decisions, <u>viz.</u>, Congress and the President.

Plaintiffs advance a number of arguments why theirs is a simple nuisance claim of the kind courts have adjudicated in the past, but none of the pollution-as-public-nuisance cases[9] cited by Plaintiffs has touched on so many areas of national and

---

[9] Plaintiffs rely on, for example, <u>New Jersey v. New York City</u>, 283 U.S. 473, 476-77 (1931) (involving garbage dumped into the ocean that polluted New Jersey beaches); <u>Georgia v. Tennessee Copper Co.</u>, 206 U.S. 230, 236 (1907) (involving a company discharging noxious gas that threatened forests, orchards, and crops in five counties); <u>State of New York v. Shore Realty Corp.</u>, 758 F.2d 1032, 1038 (2d Cir. 1984) (involving more than eleven tanks and 400 drums of substances that are considered "hazardous" within the meaning of CERCLA).

14

international policy.  The scope and magnitude of the relief

Plaintiffs seek reveals the transcendently legislative nature of

this litigation.  Plaintiffs ask this Court to cap carbon dioxide

emissions and mandate annual reductions of an as-yet-unspecified

percentage. State Compl., Prayer for Relief ¶ b.  Such relief

would, at a minimum, require this Court to: (1) determine the

appropriate level at which to cap the carbon dioxide emissions of

these Defendants; (2) determine the appropriate percentage

reduction to impose upon Defendants; (3) create a schedule to

implement those reductions; (4) determine and balance the

implications of such relief on the United States' ongoing

negotiations with other nations concerning global climate change;

(5) assess and measure available alternative energy resources;

and (6) determine and balance the implications of such relief on

the United States' energy sufficiency and thus its national

security--all without an "initial policy determination" having

been made by the elected branches.

          Defendants have set forth just a few of the difficult

"initial policy determination[s]" that would have to be made by

the elected branches before any court could address these issues:

> [G]iven    the    numerous    contributors    of
> greenhouse gases, should the societal costs of
> reducing such emissions be borne by just a
> segment of the electricity-generating industry
> and their industrial and other consumers?
>
> Should those costs be spread across the entire
> electricity-generating    industry    (including

15

> utilities in the plaintiff States)?  Other
> industries?
>
> What are the economic implications of these
> choices?
>
> What are the implications for the nation's
> energy independence and, by extension, its
> national security?

Def. Memo. at 7-8.

If there is any doubt as to the complexity of the "initial policy determination[s]" that must be made by the elected branches before a non-elected court can properly adjudicate a global warming nuisance claim, one need only look to the statements of the EPA, the agency in which "Congress has vested administrative authority" over the "technically complex area of environmental law," New England Legal Foundation v. Costle, 666 F.2d 30, 33 (2d Cir. 1981), and which has been grappling with the proper approach to the issue of global climate change for years.  For example:

> It is hard to imagine any issue in the
> environmental area having greater "economic
> and political significance" than regulation of
> activities that might lead to global climate
> change. 68 Fed. Reg. 52922, 52928 (Sep. 8,
> 2003).
>
> The issue of global climate change . . . has
> been discussed extensively during the last
> three Presidential campaigns; it is the
> subject of debate and negotiation in several
> international bodies; and numerous bills have
> been introduced in Congress over the last 15
> years to address the issue. 68 Fed. Reg. at
> 52928.

16

> Unilateral [regulation of carbon dioxide
> emissions in the United States] could also
> weaken U.S. efforts to persuade key developing
> countries to reduce the [greenhouse gas]
> intensity of their economies. 68 Fed. Reg. at
> 52931.
>
> Unavoidably, climate change raises important
> foreign policy issues, and it is the
> President's prerogative to address them. 68
> Fed. Reg. at 52931.
>
> Virtually every sector of the U.S. economy is
> either directly or indirectly a source of
> [greenhouse gas] emissions, and the countries
> of the world are involved in scientific,
> technical, and political-level discussions
> about climate change.  68 Fed. Reg. at 52928.

Considering these statements in no way undermines the

longstanding principle that the judicial branch, not the

political branches, determines, on a case-by-case basis, when a

political question is raised.  Looking at the past and current

actions (and deliberate inactions) of Congress and the Executive

within the United States and globally in response to the issue of

climate change merely reinforces my opinion that the questions

raised by Plaintiffs' complaints are non-judiciable political

questions.

The parties dispute what effect, if any, the relief

sought by Plaintiffs would have on United States foreign

relations.  Plaintiffs contend that there would no effect because

the "[o]fficial United States policy is to reduce domestic

17

emissions." Pl. Opp. at 20.[10]  Plaintiffs cite, <u>inter alia</u>, EPA
and DOE's promotion of voluntary efforts to reduce greenhouse gas
emissions, the President's statement that "[we] can make great
progress in reducing emissions, and we will.  Yet, even that
isn't enough," Congress' commissioning of research on
technologies to reduce carbon dioxide emissions, and the UNFCCC's
references to limiting emissions. Pl. Opp. at 21.  However,
official United States policy is expressed by statutes and
treaties in force, not press releases.  And in interpreting a
statute, "[o]ne must . . . listen attentively to what it does not
say." Felix Frankfurter, <u>Some Reflections on the Reading of</u>
<u>Statutes</u>, 47 Colum. L. Rev. 527, 535-36 (1947).  The explicit
statements of Congress and the Executive on the issue of global
climate change in general and their specific refusal to impose
the limits on carbon dioxide emissions Plaintiffs now seek to
impose by judicial fiat confirm that making the "initial policy
determination[s]" addressing global climate change is an
undertaking for the political branches.

     Because resolution of the issues presented here
requires identification and balancing of economic, environmental,
foreign policy, and national security interests, "an initial

_____

    [10]"Pl. Opp." refers to the Plaintiffs' Memorandum of Law in
Opposition to Defendants' Motions to Dismiss the Complaints for
Lack of Subject Matter Jurisdiction and for Failure to State a
Claim Upon Which Relief Can Be Granted filed on November 19,
2004.

18

policy determination of a kind clearly for non-judicial discretion" is required. <u>Vieth</u>, 541 U.S. at 278 (quoting <u>Baker</u>, 369 U.S. at 212). Indeed, the questions presented here "uniquely demand single-voiced statement of the Government's views." <u>Baker</u>, 369 U.S. at 211. Thus, these actions present non-justiciable political questions that are consigned to the political branches, not the Judiciary.

CONCLUSION

For the reasons set forth above, the complaints are dismissed. The Clerk of the Court shall mark these actions closed and all pending motions denied as moot.

SO ORDERED

September 16, 2005

<em>Loretta A. Preska</em><br>
Loretta A. Preska, U.S.D.J.